TORRUELLA, Chief Judge.
 

 On October 13, 1994, Defendant-Appellant Thomas D’Andrea (“D’Andrea”) was indicted on one count of bank fraud in violation of 18 U.S.C. § 1344 (Count One) and six counts of making false statements to a federally insured financial institution in violation of 18 U.S.C. § 1014. After a two-week trial in the District Court of Rhode Island, a jury found D’Andrea guilty on all counts. The district eourt sentenced D’Andrea to five years’ imprisonment on Count One and two years’ imprisonment for each of the other counts, to run concurrently, and three years’ supervised release on Count One and one year supervised release on the other counts, also to run concurrently. In addition, the district court ordered D’Andrea to make restitution to the Resolution Trust Corporation in the amount of $2.2 million for losses related to the fraudulent loan activities. D’Andrea now claims errors related to both the trial and sentencing phases. Concluding that the district court did not commit error, we affirm D’Andrea’s conviction and sentence.
 

 BACKGROUND
 

 In late 1988, D’Andrea, Robert D’Andrea (D’Andrea’s brother), Gary Lowenstein, and Michael Tulman applied for and obtained a $2.88 million loan from New England Federal Savings Bank (“New England Federal” or “the bank”), a federally insured institution. The loan was obtained for the purpose of acquiring a warehouse and truck terminal located in Cranston, Rhode Island. Because the bank would only lend up to eighty percent of the total purchase price of the warehouse, D’Andrea, and at least one of the sellers of the property, Frank Paolino, schemed to inflate the purchase price of the warehouse from just over two million dollars to $4.18 million. By so inflating the price, D’Andrea was able to receive from the bank a loan in the amount of the purchase price, thereby relieving himself and his fellow purchasers of the burden of putting any of their own money into the purchase of the warehouse.
 

 The scheme went as follows. D’Andrea represented to New England Federal that the purchasers would pay the $1.3 million difference required to meet the $4.18 million purchase price. In order to make up this gap, D’Andrea submitted false records to the bank indicating that certain deposits had already been made to the sellers. In addition, the bank requested agreements indicating the amount of rent paid by each of the tenants at the warehouse. D’Andrea forged the signatures of the officers of each of the warehouse tenants on documents that he then submitted to the bank. D’Andrea also
 
 *-631
 
 submitted a document to the bank indicating a tenant-landlord relationship with a company that never rented space at the warehouse. Two witnesses testified that D’Andrea presented them with copies of documents containing falsified rental amounts for tenants at the warehouse. D’Andrea also admitted that he forged tenant signatures on tenant-at-will agreements without the knowledge or permission of officials at the tenant-companies.
 

 During the course of the trial, D’Andrea testified that he took pains to pay off the $2.88 million loan from New England Federal. On cross-examination of D’Andrea, the government elicited testimony that he used proceeds from a $6.9 million loan from Rhode Island Central Credit Union to pay off part of that loan. D’Andrea obtained this loan along with four others, the Zarella brothers.
 
 [1]
 
 D’Andrea testified that, in obtaining this loan, he forged the signatures of the Zarella brothers’ wives on a guarantee form.
 

 Finally, D’Andrea used the warehouse property located in Cranston, Rhode Island, obtained through the use of false documents, as security for yet another loan, for $585,000 from Rhode Island Central Credit Union.
 

 DISCUSSION
 

 D’Andrea makes numerous claims on appeal, most of which we discern to be related to his sentencing. We will consider each argument individually.
 

 I. Government’s Use of the Phrase “Straw Borrowers”
 

 Without citation to any supporting ease law, D’Andrea argues as follows:
 

 At trial, over D’Andrea’s objection, the prosecutor repeatedly asked D’Andrea whether he used ‘straw borrowers’ in his dealings with Rhode Island Central Credit Union_ D’Andrea denied using. ‘straws’, but regardless, the jury could not have been unaffected, because the term ‘straw borrowers’ was a hot-button term repeatedly used by the news media to describe unsophisticated participants in real estate ventures who were said to [have] been induced to join with real estate developers in funding speculative and unsound real estate ventures.
 

 We read this statement to be an argument that the prejudicial effect of the government’s use of the term “straw borrowers” so outweighed its probative value that the district court should have barred use of the term. “Unfairly prejudicial evidence is evidence ... that ‘triggers [the] mainsprings of human action [in such a way as to] cause the jury to base its decision on something other than the established proposition in the case.’”
 
 United States v. Currier,
 
 836 F.2d 11, 18 (1st Cir.1987) (quoting 1 Weinstein’s Evidence § 408, 36-39 (1986)).
 

 We review a district court’s evidentia-ry rulings for abuse of discretion.
 
 United States v. Trenkler,
 
 61 F.3d 45, 56 (1st Cir.1995). We grant a district court’s on-the-spot determination of prejudice and proba-tiveness wide latitude and “ ‘[o]nly in exceptional circumstances will we reverse the exercise of a district court’s informed discretion vis-a-vis the relative weighing of probative value and unfairly prejudicial effect.’”
 
 United States v. DiSanto,
 
 86 F.3d 1238, 1252 (1st Cir.1996) (quoting
 
 Currier,
 
 836 F.2d at 18),
 
 cert. denied,
 
 — U.S. —, 117 S.Ct. 1109, — L.Ed.2d — (1997).
 

 Although the judge did not make explicit findings regarding the probativeness of the inquiry into the use of “straw borrowers,” the government stated that it was pursuing the inquiry as rebuttal to D’Andrea’s statement that he had approximately $100,-000 on deposit with Rhode Island Central Credit Union when the credit union closed. The government was attempting to show that, although D’Andrea lost a significant sum of money because of the failure of the credit union, he also owed the credit union millions of dollars, including money from loans obtained using others’ names.
 

 The government’s line of questioning was probative for rebuttal purposes and was limited in nature. “Rebuttal evidence may be introduced to explain, repel, contradict or
 
 *-630
 
 disprove an adversary’s proof.”
 
 United States v. Laboy,
 
 909 F.2d 581, 588 (1st Cir.1990). Moreover, once the government established in a matter of five questions that D’Andrea claimed no knowledge of such loans, it moved on and did not refer to “straw borrowers” again during the course of the trial. We find that the district court did not abuse its discretion.
 

 II. Sentencing Issues
 

 A. Relevant Conduct
 

 D’Andrea’s next claim of error suggests that the district court’s judgment during sentencing was somehow tainted by its consideration of the term “straw borrowers”:
 

 D’Andrea’s prominent role as a major borrower from [Rhode Island Central Credit Union] could not have been ignored by Judge Lagueux in his assessment of D’Andrea’s culpability, and it was his involvement in the latter that fatally infected the court’s judgment in the New England Federal Savings Bank case.... D’Andrea was not on trial for his activities involving the RISDIC-insured credit unions; and the prosecutor’s questions [regarding “straw borrowers”] were clearly intended to inflame the jury and the court.
 

 ^ ‡ ‡ ‡ ‡
 

 In considering the Government’s position, Judge Lagueux noted D’Andrea’s objections, but considered D’Andrea’s forgery of the Zarrella wive’s [sic] signatures on the loan guarantee as “relevant conduct” ....
 

 At the same time the trial judge
 
 assumed
 
 that the Zarrellas[’] role in that transaction was ... fraudulent, and he made no finding that the Zarrellas, or for that matter, any of the other alleged “straw borrowers” were involved in a scheme to defraud Rhode Island Central Credit Union, were unsophisticated investors, or were unaware of the obligations they were incurring....
 

 Appellant’s Brief at 22-24. Although appellant’s brief is difficult to decipher, D’Andrea appears to object both to the district court’s consideration of D’Andrea’s forgery of the Zarellas’ wives’ signatures and to the district court’s consideration of the alleged fraudulent nature of the loan D’Andrea obtained from Rhode Island Central Credit Union with the Zarellas. Both claims lack merit.
 

 First, the district court’s determination that D’Andrea’s forgery constituted “relevant conduct” is a finding of-fact, which we review for clear error.
 
 United States v. Tejada-Beltrán,
 
 50 F.3d 105, 109 (1st Cir. 1995). For the sentencing court to consider uncharged conduct at sentencing, “the government must show a sufficient nexus between the conduct and the offense of conviction by a preponderance of the evidence.”
 
 United States v. Young,
 
 78 F.3d 758, 763 (1st Cir.1996). Under the Sentencing Guidelines, “relevant conduct” includes acts “that were part of the same course of conduct or common scheme or plan as the offense of conviction.” U.S.S.G. § 1B1.3. For actions in the Rhode Island Central Credit Union loan acquisition and the charged offense to be considered part of a common scheme or plan, “they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi.” U.S.S.G. § 1B1.3, Commentary.
 

 We believe that the district court properly concluded that the use of forgery to obtain the Rhode Island Central Credit Union loan was part of the same scheme or plan as D’Andrea’s fraudulent efforts to obtain the loan from New England Federal. D’Andrea used proceeds from the fraudulently obtained $5.9 million credit union loan to pay off portions of the first fraudulently obtained bank loan. This, as the district court noted, amounted to a scheme by which D’Andrea “robb[ed] Peter to pay Paul.” Transcript of Sentencing Hearing, September 7, 1995, at 16. We cannot find any error here, let alone clear error.
 

 Second, the record offers some indication that the sentencing court considered D’Andrea’s use of straw borrowers as part of the fraud he perpetrated on Rhode Island Central Credit Union to obtain the $5.9 million loan. To be considered “relevant conduct,” the government must prove D’Andrea’s actions by a preponderance of the evidence. At trial, D’Andrea denied use of straw borrowers and nothing in the presentencing report supports, by a preponderance of the evidence, the conclusion that
 
 *-629
 
 D’Andrea used the Zarellas as straw borrowers. Although, on this record, it does not appear that a showing by a preponderance of the evidence was made by the government regarding D’Andrea’s use of straw borrowers, we have already determined that the loan was properly before the court as “relevant conduct” based on the forgery.
 

 Moreover, at the sentencing proceeding, D’Andrea’s trial counsel objected to enhancement of D’Andrea’s offense level on the basis of his use of straw borrowers only as it related to what he considered triple counting: use of the loan to calculate the measure of loss as a result of D’Andrea’s fraudulent activities; use of the loan as “relevant conduct”; and use of the loan to determine D’Andrea’s role in the offense.
 
 [2]
 
 D’Andrea did not object that the government had failed to prove uncharged “straw borrowers” conduct by a preponderance of the evidence to justify its consideration as “relevant conduct,” as he appears to charge here. Because D’Andrea did not preserve this argument below, we review only for plain error.
 
 See United States v. Bennett,
 
 60 F.3d 902, 905 (1st Cir.1995) (rejecting appellant’s argument raised for the first time on appeal where different argument accompanied his objection below);
 
 United States v. Tutiven,
 
 40 F.3d 1, 7-8 (1st Cir.1994) (applying plain error to sentencing argument that was not preserved below),
 
 cert. denied,
 
 — U.S.—, 115 S.Ct. 1391, 131 L.Ed.2d 243 (1995). Under this standard, we “will reverse only if the error ‘seriously affect[ed] the fundamental fairness and basic integrity of the proceedings.’”
 
 United States v. Tuesta-Toro,
 
 29 F.3d 771, 775 (1st Cir.1994),
 
 cert. denied,
 
 — U.S. —, 115 S.Ct. 947, 130 L.Ed.2d 890 (1995). Because the $5.9 million loan was properly before the sentencing court as “relevant conduct” based on the forgeries alone, the district court’s consideration of the loan based on other factors cannot be plain error.
 

 B. Amount of Loss
 

 D’Andrea claims error both in the sentencing court’s failure to depart downward for multiple loss causation regarding the amount of loss to New England Federal and in the sentencing court’s consideration of the Rhode Island Central Credit Union loan in calculating overall loss.
 

 1. The New England Federal Loan
 

 Regarding the New England Federal loan, D’Andrea contends that the loss of $2.2 million
 
 [3]
 
 to New England Federal, and its successor, Resolution Trust Corporation, had more to do with the economic climate in which it later sold the property to recover some of its loss than it had to do with D’Andrea’s conduct. He appears to argue that the district court should have recognized the multiple loss causation and departed downward to accommodate it.
 

 We begin by noting that the loss table in section 2F1.1 of the Sentencing Guidelines “presumes that the defendant alone is responsible for the entire amount of victim loss specified in the particular loss range selected by the sentencing court.”
 
 United States v. Gregorio,
 
 956 F.2d 341, 347 (1st Cir.1992). Commentary to section 2F1.1 states that a sentencing court may depart downward where it finds the loss was caused by factors in addition to the defendant’s conduct:
 

 
 *-628
 
 In a few instances, the total dollar loss that results from the offense may overstate its seriousness. Such situations typically occur when a misrepresentation is of limited materiality or is not the sole cause of the loss.... In such instances, a downward departure may be warranted.
 

 U.S.S.G. § 2F1.1, Commentary.
 

 We lack jurisdiction to review the district court’s decision not to depart downward under the long-standing rule that “a criminal defendant cannot ground an appeal on a sentencing court’s discretionary decision not to depart below the guideline sentencing range.”
 
 United States v. Pierro,
 
 32 F.3d 611, 619 (1st Cir.1994),
 
 cert. denied,
 
 — U.S. —, 116 S.Ct. 919, 130 L.Ed.2d 799 (1995);
 
 see generally, United States v. Tucker,
 
 892 F.2d 8, 9 (1st Cir.1989) (holding defendant may not appeal a district court’s decision not to depart downward).
 

 2. The Rhode Island Central Credit Union Loan
 

 D’Andrea’s argument here appears to suggest that the $5.9 million loss was not foreseeable to him because he thought he was negotiating a non-recourse loan. At trial, D’Andrea contended that he was convinced after discussions with the credit union’s president, John Lanfredi, that the loan was to be non-recourse and, therefore, the bank could not pursue the borrowers for recourse in the event of default. Because of this misperception, D’Andrea seems to suggest that he could not have foreseen the loss and thus cannot be held liable for the amount of that loss.
 

 The record shows only the following comment from D’Andrea’s counsel regarding the loss calculation: “The defendant contends under Section Fl.l(b)(l)(L) that the principal and actual loss was 1.3 million and no other factors should be considered to determine the characteristic level.” Addendum to the Presentence Report, at 2. We accordingly find that D’Andrea failed to preserve any foreseeability argument for appeal, and review only for plain error.
 
 Tuesta-Toro,
 
 29 F.3d at 775. We discern no such error here.
 

 C. Role in the Offense
 

 D’Andrea argues that the sentencing court committed reversible error when it determined, in finding that D’Andrea was a “leader” or “organizer” under U.S.S.G. section 3B1.1, that D’Andrea’s fraud included at least five participants or was otherwise extensive. D’Andrea presents no caselaw to support this proposition. Typically, finding an error of this sort, we vacate the sentence and remand to the sentencing court for re-sentencing.
 
 See, e.g., United States v. Wester,
 
 90 F.3d 592, 599-600 (1st Cir.1996) (vacating appellant’s sentence and remanding ease for resentencing upon a determination that the sentencing court had not made clear and legally supportable findings that the defendant was a leader or organizer of a fraud involving five or more participants or that was otherwise extensive)..
 

 The district court’s findings regarding D’Andrea’s role in the offense are fact-intensive and we review them for clear error.
 
 See United States v. Rostoff,
 
 53 F.3d 398, 413 (1st Cir.1995). In finding that D’Andrea was a leader or organizer of this fraud, the sentencing court determined the following:
 

 There’s no question that he was an organizer or leader of this transaction and he enlisted two other people, [Tulman] and Lowenstein, in this transaction. There’s very little evidence about [Tulman] or Lowenstein that was presented in this case but certain[ly] they had to be aware of some of the Defendant’s activities in securing this fraudulent loan and making all these false statements with the bank. Paolino was in effect a co-conspirator with him. The evidence is clear on that. Paoli-no had to know that this was a great big fraud, that the real purchase price for the property was $2.8 million and not $4.1 million as stated in the purchase and sale agreement_ [Pat Paolino] did [D’Andrea’s] road running to get all the fraudulent tenant letters together to fool the bank. And Michael Favicchio, another actor in this, he was the mortgage broker. He was the most nervous witness I ever saw on the witness stand. Michael Favic-chio knew what was going on. He wanted his fee as a mortgage broker and so he transmitted all this material that was coming from the Defendant to the bank. He
 
 *-627
 
 didn’t tell all he knew from the witness stand but he was a participant in this fraud whether wittingly or unwittingly. So there were at least five participants in this particular fraud and, of course, there were the Zarrellas in the other banking fraud with Rhode Island Central Credit Union and his forgery of the Zarrella wives’ signatures. So it seems to me that the first test is met that he was an organizer or leader with five or more participants. In any event, it was an otherwise extensive fraud and there was one other co-conspirator, Paoli-no, and so both prongs of that adjustment are met in this case and the total offense level should be increased by four.
 

 Transcript of Sentencing Hearing, at 18-19. A court making a four-level role-in-the-offense adjustment under U.S.S.G. section 3Bl.l(a) must first determine “whether the defendant acted as an organizer/leader of a specific criminal activity. If so, the court asks the separate question of whether that criminal activity involved five or more participants, defined in the Commentary as persons who are ‘criminally responsible for the commission of the offense....’”
 
 United States v. Preakos,
 
 907 F.2d 7, 10 (1st Cir. 1990) (quoting U.S.S.G. § 3B1.1, Commentary). D’Andrea does not challenge the sentencing court’s initial finding that he was an organizer or leader of criminal activity. His argument focuses on whether the district court properly found five participants in his fraud.
 

 The record indicates that the district court set out the individuals involved in the transaction, without making a specific finding that each was a “participant.” We need not determine, however, whether the court could have found by a preponderance of the evidence that D’Andrea’s fraud involved five criminally responsible “participants.” “Since the relevant language of subsection[ ] (a) ... is disjunctive, either extensiveness or riumerosity is a sufficient predicate for a ... four-level upward adjustment.”
 
 Rostoff,
 
 53 F.3d at 413. Thus, we affirm the district court’s determination of D’Andrea’s role in the offense because it properly found that his fraud was “otherwise extensive.”
 

 “[A] determination that a criminal activity is ‘extensive’ within the meaning of section 3B1.1 derives from ‘the totality of the circumstances, including not only the number of participants but also the width, breadth, scope, complexity, and duration of the scheme.’”
 
 Id.
 
 at 414 (quoting
 
 United States v. Dietz,
 
 950 F.2d 50, 53 (1st Cir. 1991)). The commentary to the Guidelines provides: “In assessing whether an organization is ‘otherwise extensive,’ all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive.” U.S.S.G. § 3B1.1, Commentary. Where a sentencing court finds that the defendant’s scheme involved one other criminally responsible participant, the “court is free to consider the use of unwitting outsiders in determining [whether] a criminal enterprise is ‘extensive’ within the contemplation of section 3B1.1.”
 
 Dietz,
 
 950 F.2d at 53. D’Andrea’s criminal activity, including relevant conduct, involved a fraud against two financial institutions whereby he obtained loans for a total of $8.1 million by submitting to those institutions documents that contained false financial information and the forged signatures of tenants and guarantors. D’Andrea’s forgeries of the tenants’ signatures attested to the accuracy of the financial information supplied to the bank, while his forgeries of the Zarellas’ wives’ signatures bound the wives to guarantee a loan in the amount of $5.9 million. He conspired with Frank Paolino, a participant under section 3B1.1, to falsify the actual sale price of the property. He manipulated figures involved in the
 
 [4]
 
 transaction to indicate that he and his co-purchasers were investing $1.3 million of their own money into the sale, when, in fact, they were not investing any of their own money. He also used the witting or unwitting services of Michael Favicchio, Pat Paolino, Michael Tulman, and Gary Lowenstein to secure the $2.88 million New England Federal loan, and of the four Zarella brothers and their wives, to obtain the $5.9 million- Rhode Island Central Credit Union loan. We find that the sentencing court quite properly determined that D’Andrea’s fraudulent schemes were extensive and thus
 
 *-626
 
 supported a four-level role-in-the-offense enhancement.
 

 D’Andrea further argues that the sentencing judge’s determination that his criminal activities were extensive impermissibly mixes “legitimate loans and development activities with isolated instances of criminal conduct.” Absolutely nothing in the record indicates that the sentencing judge considered
 
 any
 
 activities, legitimate or illegitimate, beyond those related to the New England Federal and Rhode Island Central Credit Union loans. This argument, unsupported by the record, does not alter our finding of no error in the sentencing court’s extensiveness determination.
 

 D. Obstruction of Justice
 

 The sentencing court enhanced D’Andrea’s base offense level by two points for obstruction of justice under U.S.S.G. § 3C1.1. Under that section, the sentencing court must increase the offense level by two “[i]f the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense-” U.S.S.G. § 3C1.1. Perjury falls within the scope of obstruction of justice.
 
 See
 
 U.S.S.G. § 3C1.1, Commentary. The sentencing court found that D’Andrea committed perjury on four separate occasions during the trial:
 

 I conclude that two points should be added for obstruction of justice because the Defendant committed perjury during this trial. He committed perjury time and time again. His main approach to his testimony was to lie about everything until he was backed up against the wall and then he admitted the truth, admitted forgery, but then tried to rationalize them. I can think of four instances where he committed perjury. He committed perjury concerning his lack of knowledge of the amount of money that was in the tenant letters. He denied forging some, admitted forging others. He forged them all. He committed perjury by claiming that there was another purchase and sale agreement that didn’t have the words ‘as is’ in it. Such docu- . ment was never found or presented. He was just lying through his teeth. There was no such document. He lied about his conversation with Patty El[der]. What Patty El[der] said concerning the amount of money that had to be available at closing. And he lied about the work credits. That was a substantial part of the fraud. He claimed that there were legitimate work credits taken off the purchase price to get it down to two million eight. The figures didn’t even add up.
 

 Transcript of Sentencing Hearing, at 20. ■
 

 A determination of perjury must be based on the traditional perjury test as explained by the Supreme Court in
 
 United States v. Dunnigan,
 
 507 U.S. 87, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993).
 
 Dunnigan
 
 requires a finding that “[a] witness testifying under oath or affirmation ... [gave] false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory.”
 
 Dunnigan,
 
 507 U.S. at 94, 113 S.Ct. at 1116. Here, the court found at least four instances of perjury, “but any one is sufficient” to uphold the adjustment.
 
 See United States v. Webster,
 
 54 F.3d 1, 8 (1st Cir.1995).
 

 The matters regarding which the court found D’Andrea offered false testimony were material because they concern D’Andrea’s specific intent to commit fraud, an element the jury must have found to support a guilty verdict. The sentencing court’s findings of perjury cannot be overturned unless they are clearly erroneous.
 
 United States v. Tracy,
 
 36 F.3d 199, 202 (1st Cir.),
 
 cert. denied,
 
 — U.S. —, 115 S.Ct. 609, 130 L.Ed.2d 518 (1994).
 

 Even if the record, read generously to appellant, might conceivably support some less damning scenario — and we do not suggest that it can — we would not meddle. Our review is only for clear error — and “where there is more than one. plausible view of the circumstances, the sentencing court’s choice among supportable alternatives cannot be clearly erroneous.”
 

 Tejada-Beltrán,
 
 50 F.3d at 110. Here, there was ample evidence, considering only D’Andrea’s false testimony regarding his forgery
 
 *-625
 
 of both tenant and guarantor signatures, to find that he willfully obstructed justice. On more than one occasion, D’Andrea testified on direct examination that he had permission to sign a tenant or guarantor signature, only to be caught in his lie on cross-examination and to be forced to acknowledge that he indeed committed forgery without the permission or knowledge of the pertinent “signatory.” The sentencing court could . easily have found that such direct testimony was not the result of confusion, mistake, or faulty memory. This single finding of perjury is sufficient to uphold the sentencing court’s obstruction of justice enhancement. We further note in passing, that support for the sentencing court’s other findings of perjury exist in the record and preclude a finding that they were clearly erroneous.
 
 See id.
 

 E. Restitution Order
 

 D’Andrea implores us to vacate the sentencing court’s imposition of $2.2 million restitution to be paid to Resolution Trust Corporation, the successor to New England Federal. He contends that such action is warranted because “[Restitution in the amount ordered by [J]udge Lagueux is, as a practical matter, virtually impossible of fulfillment, regardless of D’Andrea’s post-imprisonment earning capacity, and his sentence should reflect that reality.” Appellant’s Brief at 43. D’Andrea’s argument, then, is that the restitution order cannot stand because the sentencing court failed to properly take into consideration his ability to pay such an amount. The sentencing court found the following:
 

 On all these supervised release terms I impose a condition that the Defendant make restitution to the Resolution Trust Corporation in the amount of $2.2 million.
 

 I realize that’s probably unrealistic. I realize that the Defendant probably will never earn anything close to that in the future when he comes out of prison. But I want him to be aware that he has that obligation and that any earnings that he makes will go toward restitution.
 

 Transcript of Sentencing Hearing, at 32.
 

 “In fashioning a restitution order, a court must consider ‘the amount of the loss sustained by any victim as a result of the offense, the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant’s dependents, and such other factors as the court deems appropriate.’ ”
 
 United States v. New
 
 man, 49 F.3d 1, 10 (1st Cir.1995) (quoting 18 U.S.C. § 3664(a) (1988)). The sentencing court is not required to base its determination on a finding that the defendant has the ability to repay the ordered amount-of restitution.
 
 United States v. Royal,
 
 100 F.3d 1019, 1033 (1st Cir.1996). Instead, there must only be an indication that the sentencing court considered D’Andrea’s financial situation in arriving at its figure.
 
 Id.
 
 The record here sufficiently supports the conclusion that the sentencing court considered all of the relevant factors in making its determination. That is all that is required.
 

 Moreover, should this restitution order prove so unreasonably onerous that D’Andrea is clearly unable to meet his responsibilities, he may move the district court to modify it pursuant to 18 U.S.C. § 3663(g).
 

 III. Judicial Misconduct
 

 D’Andrea peppers the “Argument” section of his appellate brief with allegations of judicial bias and misconduct.
 
 [4]
 

 
 *-624
 
 An inquiry into the judge’s conduct of the trial necessarily turns on the question of whether the complaining party can show serious prejudice.... In answering this question a reviewing court must evaluate the judge’s actions ‘according to a standard of fairness and impartiality, recognizing that each ease tends to be fact-specific.’
 

 ... This process requires the reviewing court to differentiate between expressions of impatience, annoyance or ire, on the one hand, and bias or partiality, on the other.
 

 Logue v. Dore,
 
 103 F.3d 1040, 1045 (1st Cir. 1997) (quoting
 
 United States v. Polito,
 
 856 F.2d 414, 418 (1st Cir.1988)) (citations omitted).
 

 D’Andrea points to nothing in the record to support his allegations, nor does he demonstrate any prejudice. After painstakingly poring over nearly 1,450 pages of transcript from both the trial and sentencing hearing, we are left with the unmistakable conclusion that Judge Lagueux did not engage in a single act of “impatience, annoyance or ire,” let alone bias or misconduct. D’Andrea’s allegations are meritless.
 

 CONCLUSION
 

 Based on the foregoing considerations, we affirm the district court’s rulings.
 

 [1]
 

 . This name is spelled "Zarella” in the trial transcript and "Zarrella” in the sentencing hearing transcript. For purposes of consistency, we will use the spelling "Zarella." Some quotations taken from Appellant's Brief contain the spelling “Zarrella.”
 

 [2]
 

 . D’Andrea’s counsel’s objection was stated as follows:
 

 In addition, your Honor, it’s counsel’s opinion that all of the reference with respect to the adjustment for the role of the offense of straw borrowers in the state case, cases, is, again, an attempt with an increase of a level 4 to subject Mr. D'Andrea to additional punishment for something that has not been decided. I realize there are federal cases that say in fact that can be done. My point is that it’s being done three times to him on three different levels for three different types of consideration under the guidelines. I don’t think that's appropriate. Certainly if the Court finds that it's "relevant conduct" it can consider it. But it considers it as to the amount of the loan, as to the "relevant conduct”, as to his participation in the offense. It’s all the same thing. But yet he gets increased levels for that kind of activity and I don’t think that's appropriate.... So my suggestion to the Court is that although the level with respect to fraud is six it can be increased but it should not be increased three fold with respect to those particular items.
 

 Transcript of Sentencing Hearing, at 13-14.
 

 [3]
 

 . The amount of loss was determined by subtracting from the original $2.88 million loan the amount recovered at the ultimate sale of the property by Resolution Trust Corporation, roughly $600,000.
 

 [4]
 

 . Appellant’s bald assertions of misconduct include the following:
 

 —"D’Andrea's prominent role as a major borrower from [Rhode Island Central Credit Union] could not have been ignored by Judge Lagueux in his assessment of D'Andrea's culpability, and it was his involvement in the latter that fatally infected the court's judgment in the New England Federal Savings Bank case.” (citing to a newspaper article in the March 6, 1996 issue of the Providence Sunday Journal). Appellant’s Brief, at 22.
 

 —"Given the depressed economic climate and hostile political atmosphere prevailing in Rhode Island since 1991, and the fact that Rhode Islanders will be repaying the losses ... well into the 21st Century, it is unsurprising that heavy borrowers, including D’Andrea would be demon- . ized, both in the public mind, and as political scapegoats. Judge Lagueux also appears to have been infected by the clamor, and that his sentence reflected a willingness to punish D'Andrea for his involvement with [Rhode Island Central Credit Union], on a dubious theory of liability,
 
 *-624
 
 without specific proof of fraud or conspiracy presented.”
 
 Id.
 
 at 26.
 

 —"Moreover, [Rhode Island Central Credit Union], a privately insured financial institution, subject to weak state regulation and political intrigue with the Rhode Island Legislature and Statehouse makes a weak case on which the Government can rely. Absent proof he violated specific prohibitions, moral condemnation is not enough to sustain D’Andrea’s punishment.... This distinction was apparently lost on Judge Lagueux, and he regarded the [Rhode Island Central Credit Union] and [New England Federal] transactions as correlatives both in time and intent. Given the limited information- the judge had before him, linking the two together in his own mind in order to quadruple the punishment meted out to D’Andrea strongly suggests that the prior publicity about RISDIC and [Rhode Island Central Credit Union] had an effect.”
 
 Id.
 
 at 30. —."A fair reading of the sentencing hearing transcript yields but one conclusion, that Judge La-gueux’s comments from the bench say more about what he thought D'Andrea stood for than about conduct for which D’Andrea bears legitimate responsibility.”
 
 Id.
 
 at 35-36.
 

 —"Judge Lagueux determined that virtually every disagreement between D'Andrea’s testimony and the testimony of witnesses against him was perjurious. Those findings were entirely one-sided and unfair.... The entire tenor of Judge Lagueux's comment showed his predisposition to discount everything D’Andrea said, regardless of the probability that one or more of the Government’s witnesses was not telling the entire truth.”
 
 Id.
 
 at 39-41.