USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit
 ____________________

No. 96-1635

 UNITED STATES OF AMERICA,

 Appellee,

 v.

 EDDIE LEE ANDERSON
 a/k/a BRIAN McKNIGHT,

 Defendant, Appellant.

 ____________________

No. 96-1738

 UNITED STATES OF AMERICA,

 Appellee,

 v.

 MICHELLE COUTERMARSH,

 Defendant, Appellant.

 ____________________

 APPEALS FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. Patti B. Saris, U.S. District Judge]
 ____________________
 
 Before

 Selya, Circuit Judge,

 Bownes, Senior Circuit Judge,

 and Stahl, Circuit Judge.

 ____________________
 John C. McBride, with whom McBride & Associates was on
brief for appellant, Eddie Lee Anderson. 

 Susan K. Howards, with whom Launie and Howards, P.A., was
on brief for appellant Michelle Coutermarsh.

 Jeanne M. Kempthorne, Assistant United States Attorney,
with whom Donald K. Stern, United States Attorney, was on brief for
appellee.

 ____________________
 March 27, 1998

 ____________________

 -2- BOWNES, Senior Circuit Judge. Appellants Eddie Lee
Anderson and Michelle Coutermarsh were each convicted in the
district court of three counts involving transportation of minors
and other individuals across state lines for purposes of illegal
sexual activity prostitution. 18 U.S.C.A. 2421, 2423(a) (West
Supp. 1998). They bring separate appeals, which we have
consolidated for purposes of argument and opinion. We address
their individual arguments first, before turning to the positions
common to both appellants. We affirm both convictions and
sentences.
 As is required, "we sketch the facts in the light most
favorable to the jury verdict, consistent with record support." 
United States v. Pitrone, 115 F.3d 1, 3 (1st Cir. 1997). For a
number of years, Anderson and Coutermarsh operated a prostitution
business that involved both juvenile and adult women. The center
of these operations during the offense conduct was Dracut and
Lowell, Massachusetts, where Anderson and Coutermarsh each had
separate households. At the time of the offenses charged, the
organization included adult prostitutes Coutermarsh, Kelly Munger,
Inez Walsh, and juveniles Christy, Jasmine, and Jessica. Anderson
and Coutermarsh were assisted in their activities by Norris Scott,
who basically ran errands for Anderson. Scott, who was included in
the indictment, pled guilty before trial.
 Anderson received all of the prostitutes' earnings, in
exchange for which the women and girls were given food, clothing,
shelter, and drugs. Each prostitute was identified by a gold name
tag necklace, and each had been given Massachusetts identification
cards with false names and birth dates which were obtained by
Anderson through a connection at the local Registry of Motor
Vehicles. These identification cards gave the juveniles access to
establishments from which they would otherwise have been excluded
because of their ages.
 The charges at issue stem from two trips made from
Lowell, Massachusetts, to Atlantic City, New Jersey, in February,
1995. On or about February 21, 1995, Anderson and Scott left the
Lowell area with two adult women and two juveniles, Jasmine and
Jessica. The group traveled in three cars Anderson's Mercedes,
Coutermarsh's Acura, and a rental car. While they were bound
initially for Atlantic City, the group apparently planned to
continue on to Las Vegas, Nevada, at some later date. Coutermarsh
stayed in Massachusetts, ostensibly to arrange for the
transportation of her and Anderson's belongings to Nevada. 
 Upon arrival in New Jersey, the group housed themselves
at the Luxury Inn in Absecon. Norris Scott rented the rooms under
an alias. Anderson and Scott obtained beepers for the women and
juveniles, and listed them with local escort services. The
prostitutes began to work what is known as "The Track" in Atlantic
City an area where sex was sold. Several days after arrival, on
or about February 25, 1995, Anderson and Scott returned to
Massachusetts with the juvenile Jessica, in order to head off a
possible kidnapping charge by assuaging Jessica's family with false
information about her activities and whereabouts. After Anderson's
meeting with Jessica and her aunt, Coutermarsh drove Jessica into
Boston for prostitution and in the early morning hours of
February 26, 1995, put her on a train back to New Jersey. Jessica
testified that Coutermarsh paid for the ticket with cash that
Anderson had given her.
 It was not long thereafter that things began to go awry
for Anderson and his organization. To make the short of it,
automobiles were impounded by the authorities and some of the
prostitutes were arrested. This was followed by the arrests of
Anderson, Scott, and Coutermarsh.
 I
 A We examine Anderson's independent positions on appeal
first. Anderson initially appeals the district court's denial of
his motion for a new trial, which we review for "manifest abuse of
discretion." United States v. Brimage, 115 F.3d 73, 79 (1st Cir.), 
cert. denied, 118 S. Ct. 321 (1997). The motion below was brought
on the basis of "newly discovered evidence," allegedly withheld by
the government in violation of Brady v. Maryland, 373 U.S. 83
(1963). Anderson posits that the evidence demonstrates government
inducements to juvenile witnesses Christy and Jessica in exchange
for their testimony against Anderson. Had he been privy to this
information, Anderson argues, his ability to impeach these key
witnesses would have been substantially improved. While we have
suggested that newly discovered impeachment evidence might in some
circumstances warrant a new trial, see United States v. Sepulveda,
15 F.3d 1216, 1220 n.5 (1st Cir. 1993), we do not think that
Anderson's offering meets the high standard required of him:
"probably produc[ing] an acquittal upon retrial." United States v.
Ortiz, 23 F.3d 21, 27 (1st Cir. 1994).
 Anderson directs us to two bits of evidence to
substantiate his claim: (1) a notation in Coutermarsh's Presentence
Report ("PSR") that Christy and her father were critical of the
government because "[b]oth were of the opinion that if Christy
cooperated in the investigation, agents would assist her in
securing employment," Coutermarsh PSR 30, Coutermarsh App. at 76;
and (2) the fact that Jessica had a Child In Need of Services
("CHINS") warrant outstanding at the time she testified. From
these threads Anderson argues that it can be inferred that
inducements were offered to the juveniles to testify for the
government, and were accepted. There is no evidence to support
what are, at the most, suspicions. Moreover, there is such a lack
of developed argumentation on appeal as to warrant a finding of
waiver. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir.
1990). 
 We need not recite all the familiar requirements that a
defendant must meet in order to prevail on a motion such as this. 
See Ortiz, 23 F.3d at 27. It is enough to reiterate that "new
trials based on newly discovered evidence, or on evidence withheld
by the prosecution, require specified showings as to the likelihood
of a different result." Sepulveda, 15 F.3d at 1219. 
 Anderson's claim fails because he has not even attempted
to demonstrate how such proof would warrant a new trial. Even
assuming, arguendo, that Christy and her father thought that some
benefit would accrue as a result of her testimony, we do not think
that inclusion of such evidence would probably produce an acquittal
the next time around. Christy was not one of the juveniles
transported to New Jersey, and her testimony was largely background
information which set the stage for the offense conduct. Our
examination of the record leads us to conclude that the verdict
would stand even without Christy's testimony. Similarly, the mere
fact of an outstanding CHINS warrant, without more, does little to
alter the legitimacy of Jessica's testimony. After our review of
the record we find that the district court was correct when it
determined that, "[t]his so-called new evidence, . . . even when
considered cumulatively, is insufficient to undermine confidence in
the verdict." United States v. Anderson, No. 95-10110-PBS, slip
op. at 8 (D. Mass. May 8, 1996).
 B Anderson's next argument fares no better. Referring us
to United States v. Pion, 25 F.3d 18, 22-24 (1st Cir. 1994),
Anderson contends that he was denied his right under the Sixth
Amendment to be tried by a jury drawn from a representative cross
section of the community. During the jury selection process,
Anderson, who is African-American, objected to the fact that only
one individual in the jury pool was of his race. He suggests that
such an "unconstitutionally disproportionate" jury pool mandates
reversal of the jury's verdict.
 This constitutional claim cannot rest on racial
disproportion without more. The defendant also must show that the
"underrepresentation is due to systematic exclusion of the group in
the jury-selection process." Duren v. Missouri, 439 U.S. 357, 364
(1979) (emphasis added). Anderson does not even attempt to make
such a showing here, and therefore his claim fails. 
 C
 Anderson next argues that the district court was
incorrect to apply enhancements at sentencing to his base offense
level for (1) supervisory role in the offense, (2) coercion, and
(3) obstruction of justice. He does not contend that any legal
error transpired. In such instances, "appellate review must be
conducted with considerable deference. Absent an error of law
. . . the sentencing court's determinations are to be set aside
only for clear error." United States v. Cruz, 120 F.3d 1, 3 (1st
Cir. 1997) (en banc), cert. denied, 118 S. Ct. 729 (1998). As to
all three assignments of error, Anderson only suggests that the
government failed in its obligation to prove his qualification for
the enhancements by a preponderance of the evidence. Id. We
disagree.
 We begin with the supervisory role in the offense
enhancement. The district court enhanced Anderson's base offense
level under U.S.S.G. 3B1.1 because it was satisfied that Anderson
was a manager, supervisor, and organizer of an otherwise extensive
criminal activity. Memorandum of Sentencing App. at 2, Anderson
App. at 50. Judge Saris found that although she did not have five
or more "participants" for purposes of the enhancement, she did
have sufficient evidence that the scheme was "otherwise extensive."
 We have held that the "determination that a criminal
activity is 'extensive' within the meaning of section 3B1.1 derives
from 'the totality of the circumstances, including not only the
number of participants but also the width, breadth, scope,
complexity, and duration of the scheme.'" United States v.
Rostoff, 53 F.3d 398, 414 (1st Cir. 1995) (quoting United States v.
Dietz, 950 F.2d 50, 53 (1st Cir. 1991)). The record facts here
support the district court's decision. A significant number of
women were under Anderson's control one witness testified at
sentencing that the number was eight. Anderson utilized the
services of several other individuals (in two states) in pursuit of
his activities, see United States v. D'Andrea, 107 F.3d 949, 957
(1st Cir. 1997), and his plans involved, at a minimum,
transportation of individuals for prostitution in three states. On
this record, we can only say that Judge Saris was well within the
boundaries of U.S.S.G. 3B1.1 when she found Anderson's
prostitution ring to be "otherwise extensive."
 Any attempt by Anderson to challenge the district court's
finding that he was the supervisor or manager of the enterprise is
futile in the face of the evidence. He received all the earnings
of the women and girls, and there was more than sufficient
unrebutted testimony for the district court to find that he
directed their activities at all times relevant to the offenses.
 The district court also enhanced Anderson's base offense
level because it found evidence of coercive conduct with regard to
one of the juvenile prostitutes. U.S.S.G. 2G1.2(b)(1). Judge
Saris found that,
 [w]hile there was no physical force used to
 induce these girls to go to New Jersey, with
 respect to Jasmine, I find by a preponderance
 of the evidence that there was "coercion",
 which "includes any form of conduct that
 negates the voluntariness of the behavior of
 the person transported." 2G1.2, Application
 note 3. While I agree with defense counsel
 that one motivating factor in taking the trip
 to New Jersey was Jasmine's fear of losing
 Jessica, I also find that a substantial
 motivating factor was defendant's coercive
 behavior to her. In particular, I rely on the
 following three factors. First, he had within
 the previous week raped her when she said no
 to sexual intercourse. Second, he gave the
 girls approximately an ounce of marijuana
 daily. Jasmine testified that she was almost
 always high, including on the trip to New
 Jersey, and told the probation officer that
 she could not have engaged in the prostitution
 activities if she had not been high. The
 guidelines say that coercion can result where
 the ability of the person being transported to
 control or appraise conduct was substantially
 impaired by drugs. Application note 3. 
 Third, Anderson accompanied the car driven by
 Jasmine in a caravan to New Jersey.
 
Memorandum of Sentencing App. at 2-3, Anderson App. at 50-51. The
findings of the district court are well borne out by the record. 
 Anderson suggests that because Jasmine testified that she
was "not forced" to go to New Jersey, the coercion enhancement
should not apply. Coercion, however, has a more complex meaning
than Anderson acknowledges. "[C]oercion must at a minimum involve,
conceptually speaking, an impending threat of some negative
consequence that will affirmatively befall a person if he or she
does not succumb to the pressure that is being exerted." United
States v. Sabatino, 943 F.2d 94, 104 (1st Cir. 1991). Jasmine was
undoubtedly under Anderson's control when she went to New Jersey. 
Anderson consistently supplied her with an amount of marijuana
which was sufficient to impair her voluntariness. And Anderson
forcefully raped Jasmine just one week before leaving for New
Jersey when Jasmine refused to have sex with him. This rape
impressed on Jasmine Anderson's power over her. The record also
demonstrates that Jasmine knew that bad things happened to those
who crossed Anderson. Jessica testified at sentencing that
although she did not want to make the journey, Anderson "wanted his
girls to go," Anderson Disp. I, at 108, and she went. The record
clearly establishes coercion of Jasmine by Anderson sufficient for
the enhancement.
 Finally, Anderson disputes the district court's decision
to enhance his base offense level because of his attempted
obstruction of justice. U.S.S.G. 3C1.1. The district court
determined that,
 [a]fter evaluating the credibility of Jessica,
 one of the juvenile victims, at trial, and at
 the sentencing hearing, I find her testimony
 credible that defendant's son, a school
 friend, gave her money ($3500) to sign an
 affidavit on defendant's behalf retracting her
 accusations, and a bus ticket to prevent her
 from testifying. I further find that
 defendant instructed his son to tamper with
 this witness.
Memorandum of Sentencing App. at 1, Anderson App. at 49. The
record contains a preponderance of evidence to support the
enhancement.
 II
 A Appellant Coutermarsh's first attack is against the
district court's decision to depart upwards under U.S.S.G. 3B1.1
for her supervisory or managerial role in the offense. Judge Saris
acknowledged that she could not enhance Coutermarsh's sentence
under U.S.S.G. 3B1.1 because none of the other prostitutes were
"participants" in the transportation offense itself. See United
States v. Jarrett, 956 F.2d 864, 868 (8th Cir. 1992). She based
her decision to depart upwards by two levels on U.S.S.G. 3B1.1
comment 2, which allows departures "in the case of a defendant who
did not organize, lead, manage, or supervise another participant,
but who nevertheless exercised management responsibility over the
property, assets, or activities of a criminal organization." We
review sentencing departures for abuse of discretion. Koon v.
United States, 116 S. Ct. 2035, 2046-47 (1996). Coutermarsh does
not contend that it was legal error for the district court to
depart nor could she, see United States v. Cali, 87 F.3d 571,
580-81 (1st Cir. 1996) just that the record facts do not support
the decision.
 Judge Saris specifically found a departure "warranted,
with respect to the Jessica grouping only, because Coutermarsh
exercised supervisory/management responsibility over Jessica's
prostitution activities, and over one aspect of her inter-state
transportation." Memorandum of Sentencing App. at 2, Coutermarsh
App. at 113. We fail to see any abuse of discretion, given the
evidence supporting the decision. See Koon, 116 S. Ct. 2046-47. 
Jessica testified at trial that Coutermarsh "was basically telling
me how to make the money, you know, how to act when I was out
there," Tr. III at 25, and that before leaving for Atlantic City
Coutermarsh instructed Jessica on "what casino to go to and . . .
what to do in casinos to attract dates and how to get them," id. at
47. Jessica also testified that after a night of prostitution in
Boston, just before being sent back to Atlantic City, she "told
[Coutermarsh] I was real sick, but she told me she knew how sick I
was, but I had to bring some money home." Id. at 60. It was the
following morning that, as Jessica stated, Coutermarsh "bought my
train ticket" and instructed her on what to do when she arrived in
New Jersey. Id. at 61. We do not think these facts are, as
Coutermarsh suggests, legally insufficient to support the
departure. We have upheld an enhancement under this section when
"'a defendant, in committing the crime, exercised control over, or
was otherwise responsible for overseeing the activities of, at
least one other person.'" United States v. Voccola, 99 F.3d 37, 44
(1st Cir. 1996) (quoting United States v. Savoie, 985 F.2d 612, 616
(1st Cir. 1993)). And, as required, we are highly deferential to
the departing court's factual determinations under the abuse of
discretion standard. Koon, 116 S. Ct. at 2046.
 Coutermarsh argues that Jessica is simply not to be
believed. To be sure, inconsistencies were revealed in Jessica's
testimony during cross-examination. A witness's veracity, however,
can be debated for the legal equivalent of eternity, and some
record support for a contention of untruthfulness can usually be
found. This is precisely the reason why, "[i]n the sentencing
phase, credibility determinations lie within the domain of the
district court. Only rarely and in the most urgent circumstances
 will we, from the vista of a sterile appellate record, meddle in
such matters." United States v. St. Cyr, 977 F.2d 698, 706 (1st
Cir. 1992). No such rare urgency exists here.
 B Coutermarsh's next assignment of error concerns the
district court's decision not to depart downward on the basis of
U.S.S.G. 5K2.13 (Diminished Capacity), and 5K2.12 (Coercion and
Duress). Our task on this point is initially complicated by our
need to determine whether Coutermarsh asserts a legal mistake or 
a claim that the district court unreasonably refused to depart on
the facts presented. As we explained recently in United States v.
Saldana, "a defendant may appeal from [her] sentence . . . if it
was imposed 'in violation of law' or by 'an incorrect application
of the sentencing guidelines'; but the defendant may not appeal
from a sentence within the guideline range if there was no legal
error and the only claim is that the district court acted
unreasonably in declining to depart." 109 F.3d 100, 102 (1st Cir.
1997)(quoting 18 U.S.C. 3742). Thus, if Coutermarsh is
"present[ing] a claim of legal error, or at least a colorable
claim," id. at 103 (emphasis in original omitted), we review it. 
Otherwise, if "the defendant's only claim on appeal [is] that,
although the district court had understood its authority, it abused
its discretion in declining to depart. . . . [,] the government is
within its rights to remind us that the abuse of discretion claim
is not subject to review." Id.
 There is no question with regard to the claim for
departure on the basis of diminished capacity. Judge Saris based
her decision on the results of a psychiatric evaluation, which she
determined did not demonstrate enough diminished capacity for a
downward departure. Because there is no suggestion of legal error,
Coutermarsh's appeal on this claim is not reviewable.
 Judge Saris's refusal to depart on the basis of coercion
and duress is not so simply decided. Our task is muddied because
Coutermarsh's counsel does not specifically address whether this is
a claim of legal error. We, therefore, proceed with caution
because the asserted claim could encompass such a mistake. We
explain. The primary contention here is that Coutermarsh is an
abused woman, who in a single past incident had been subject to
physical violence perpetrated on her by Anderson. As a result of
that past incident, her counsel at sentencing asserted that she
remained in her relationship with Anderson under continuing
coercion and duress, and thus is entitled to a departure on that
basis. 
 Therefore, if Judge Saris had been concerned that a
single past act of physical violence was insufficient as a matter
of law to support a coercion/duress departure, our review as to
that legal determination would, of course, be appropriate. Koon,
116 S. Ct. at 2047. Our evaluation of the sentencing transcript,
however, convinces us that this was not the case. Judge Saris did
not imply that the past violence was legally insufficient for a
departure. Indeed, she recognized that evidence of such violence
was "helpful to [Coutermarsh]." Disp. Tr. at 51. She denied the
downward departure because she found no evidence of the coercive
effect of that violence during what she considered to be the
relevant time period. Disp. Tr. at 60. She further expressed her
reluctance to depart on the basis of information whose source was
not subject to any cross-examination, or other evidentiary filters. 
We think this demonstrates that her decision rested on the
evidence's lack of persuasive effect and did not encompass any
legal error. As a result, we are not at liberty to disturb her
discretionary determination.
 Coutermarsh also suggests that Judge Saris committed
plain error for refusing to depart on the basis of United States v.
Rivera, 994 F.2d 942 (1st Cir. 1993), which held that "the
sentencing court is free to consider, in an unusual case, whether
or not the factors that make it unusual (which remove it from the
heartland) are present in sufficient kind or degree to warrant a
departure," id. at 949. Coutermarsh argues that her particular
diminished capacity and coercive situation are so peculiar as to
remove her case from the "heartland" of the standard diminished
capacity and coercion departure provisions. The defendant has
similarly failed to argue that there is any indication in the
record that the district court misunderstood its legal authority to
depart under the heartland analysis described in Rivera. As a
result, we will not review this claim. See, e.g., United States v.
Boots, 80 F.3d 580, 594 (1st Cir.), cert. denied, 117 S. Ct. 263
(1996) (refusing to review a district court's discretionary
judgment that the case did not involve such unusual circumstances
to justify taking it "outside the Guidelines' 'heartland'"). III We now reach the two claims of error which are common to
Anderson and Coutermarsh. Although the appellants have each
briefed these questions separately, both claims concern alleged
evidentiary trial errors which if unduly prejudicial to one
defendant, would have been similarly unfair to the other. As such,
we address them without much differentiation between the
appellants.
 A 
 Appellants argue that the "admission" of certain phone
records into evidence was improper and thus mandates a new trial. 
As an initial matter, no phone records were admitted into evidence. 
There was only testimony about phone records. The claimed error
finds its nexus in the government's re-direct examination of
Atlantic City Police Detective Robert Clarke concerning the
completeness of certain phone records relied on by one of the
defendants during a previous cross-examination. Defendants claim
that the district court erred in allowing this testimony because it
went beyond the scope of the cross-examination, was not provided
during discovery, and was more prejudicial than probative.
 We set the stage. Jessica had testified during the third
day of trial that at some point during her stay in Absecon, she
telephoned her aunt from her room at the Luxury Inn. She also
testified that Anderson and Norris had discovered her contacts with
her family when they checked with the motel to see what calls were
being made from the rooms they had rented. The next day, on the
fourth day of trial, Anderson's counsel attempted to establish,
through cross-examination of Atlantic City Police Detective Angelo
Maimone, that Jessica was lying about calling her aunt from the
Luxury Inn, and therefore her credibility was questionable. 
 Anderson's counsel elicited testimony from Detective
Maimone that when Maimone reviewed some telephone records from the
Luxury Inn, he did not see a record of any phone call being made to
Massachusetts, nor did he see any record of any calls from the room
that Jessica had occupied. Maimone testified that the F.B.I. had
obtained the records, and that he had reviewed them in the course
of his own investigation. Anderson's counsel showed Maimone a copy
of the records during the cross-examination, without having them
entered into evidence. The government objected to the use of these
copies without proper authentication, but the district court
allowed the testimony because it mistakenly thought that the phone
records were part of the materials that the government had released
to Anderson during discovery. In fact, Anderson's counsel had
obtained the copies from Anderson's New Jersey lawyers, where a
state prosecution was also moving forward. The government received
a copy of the records from Anderson's counsel after the close of
evidence on that fourth day, and reviewed them.
 The next morning, before the fifth day of testimony, the
government renewed its objection to the defendant's use of the
phone records testimony. In the process of the side-bar
conference, it was explained to the district court that the phone
records at issue had not been provided to the defendants by the
federal prosecutor, but had actually come from another source. The
district court recognized that it had been error to allow
Anderson's counsel to show the copies to Detective Maimone without
a proper authentication. It decided to correct the error by
allowing the government to explain what the records actually were
during its redirect examination of Detective Clarke, Detective
Maimone having already returned to New Jersey. The district court
took this action because it determined that "[t]here was an obvious
problem raised . . . which in the interest of justice needs to be
addressed." Tr. V at 61. 
 Detective Clarke proceeded to testify that the F.B.I. had
not obtained telephone records for the room in which Jessica had
stayed, but only obtained records for three other rooms also rented
by Anderson and Scott. The government was thus able to rebut the
impeachment evidence by showing that the records relied on by
Anderson's counsel could not prove that Jessica had not made any
telephone calls to Massachusetts.
 We fail to see how Detective Clarke's testimony unfairly
prejudiced the defendants. The testimony weakened what might have
been a successful assault on Jessica's credibility. That, of
course, was exactly the point of the rebuttal. After all,
"[v]irtually all evidence is prejudicial if the truth be told,
that is almost always why the proponent seeks to introduce it but
it is only unfair prejudice against which the law protects." 
Pitrone, 115 F.3d at 8. Further, the decision to admit the
testimony through Detective Clarke was well within the district
court's discretion under Fed. R. Evid. 611(a) and (b).
 B The final issue in these appeals concerns the conflict
between the district court's desire to protect from disclosure
certain information concerning the two juvenile witnesses, and the
defendants' Sixth Amendment rights to an effective cross-
examination of them. As an initial matter, we dispose of a related
issue with little merit. Relying on portions of the Victims'
Protection and Rights Act, 18 U.S.C.A. 3509(d)(3), Judge Saris
ordered that, in order to protect their identity, the last names of
the juvenile witnesses not be disclosed during the trial. 
Coutermarsh contends that this action lent impermissible credence
to the two witnesses' testimony by setting them apart from the
other witnesses at trial. The record, however, reveals that Judge
Saris was careful to balance the defendants' rights with those of
the juvenile witnesses. The courtroom was not closed, as
authorized by the statute, see 18 U.S.C.A. 3509(e), and the full
names of the juvenile witnesses were properly disclosed to the jury
pool during impanelment. We simply fail to see how this protective
order somehow bolstered the government's case, perhaps because
Coutermarsh makes no attempt to explain it to us. Because we can
find nothing in the record to lend credence to Coutermarsh's
theory, we shall move on to an argument with a little more
substance.
 Both appellants contend that they were denied their right
to effective cross-examination by several of the district court's
decisions restricting foray into (1) the juvenile witnesses' past
commercial sexual histories, (2) the fact that one juvenile witness
had a two-year-old child, and (3) certain information indicating
bias. Before we examine each claim, we lay out the relevant legal
framework.
 The Confrontation Clause of the Sixth Amendment ensures
a criminal defendant the right to cross-examine witnesses. Davisv. Alaska, 415 U.S. 308, 315 (1974). "Although the trial judge
retains the traditional discretion to limit the scope of cross-
examination, discretion in the area of bias evidence becomes
operative only after the constitutionally required threshold level
of inquiry has been afforded the defendant." United States v.
Tracey, 675 F.2d 433, 437 (1st Cir. 1982). We have a similar test
with regard to the general area of a witness's truthfulness. Thus,
"one factor to be considered is the extent to which the excluded
question bears upon character traits that were otherwise
sufficiently explored. The court need not permit unending
excursions into each and every matter touching upon veracity if a
reasonably complete picture has already been developed." Id.(quoting United States v. Fortes, 619 F.2d 108, 118 (1st Cir.
1980)). In all, "trial judges retain wide latitude insofar as the
Confrontation Clause is concerned to impose reasonable limits on
such cross-examination based on concerns about, among other things,
harassment, prejudice, confusion of the issues, the witness's
safety, or interrogation that is repetitive or only marginally
relevant." Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986). 
 What remains the crucial question throughout these claims
is whether a "'minimum threshold of inquiry' [was] afforded a
defendant in the cross examination of an adverse witness." Brownv. Powell, 975 F.2d 1, 5 (1st Cir. 1992) (quoting United States v.
Jarabek, 726 F.2d 889, 902 (1st Cir. 1984)). In the usual case, if
"the jury had sufficient other information before it, without the
excluded evidence, to make a discriminating appraisal of the
possible biases and motivations of the witness," Tracey, 675 F.2d
at 437, the constitutional "minimum threshold" is met. See United
States v. Carty, 993 F.2d 1005, 1010 (1st Cir. 1993). Finally, and
perhaps most importantly here, "[t]o establish that the district
court has abused its discretion, the defendant must show that the
limitations imposed were clearly prejudicial." United States v.
Williams, 985 F.2d 634, 639 (1st Cir. 1993). It follows logically,
therefore, that should an error be revealed, we may affirm the
conviction if we are confident that it was harmless beyond a
reasonable doubt. Van Arsdall, 475 U.S. at 681.
 As we stated, three potential constitutional violations
have been brought to our attention by appellants. We address each
in turn. The first argument is that the district court erred on
the first day of trial when it refused to allow evidence of
commercial sexual activity by the juveniles that occurred both
before and after the relevant time period. While Judge Saris
explicitly stated that "there is going to be no [evidence of]
conduct outside [the relevant period]," Tr. I at 127, she left
specific exclusions to another day, stating that "I don't know
enough about this case," id. She was clear that she was "going to
have to deal with it as it comes," id. at 126, and left the door
open for the possibility that "something pops up and there is a
prior inconsistent statement," id. at 127. Coutermarsh does not,
however, direct us to any specific exclusions. We are left,
therefore, with only the question whether the general prohibition
was constitutionally defective. 
 Coutermarsh argues that the excluded information would
have been useful to impeach the juveniles' credibility. We fail to
see how evidence of prostitution outside the offense conduct would
have any probative value regarding the truthfulness of the two
girls. Such a position seems to us to embody a particularly
offensive form of stereotyping to which we are loath to give
credence. Regardless, both witnesses' credibilities were
thoroughly, and quite effectively, tested without the foray into
their sexual history. Nor do we see how such evidence would have
impeached the substantive testimony offered by the juveniles. The
indictment alleged transportation of the minors for purposes of
prostitution. Any propensity to engage in prostitution would have
had no bearing on what the jury needed to find in order to reach a
guilty verdict. As a result, there could be no unfair prejudice by
excluding this immaterial information.
 The next claim posits that the district court's failure
to permit cross-examination on the fact that juvenile witness
Jessica had a two-year-old child was constitutional error. At
trial, Coutermarsh's counsel was seeking to discredit Jessica's
assertion on direct that she called her aunt because she "missed
her family." If, Coutermarsh's counsel reasoned, the government's
direct examination had elicited this statement, he should have been
allowed to discredit her testimony by demonstrating that she had
earlier abandoned her child and therefore could not have "missed
her family." Judge Saris refused to allow this line of examination
because its probative value was substantially outweighed by
potential prejudice. See Tr. III at 103-05. We cannot say her
decision violated either defendant's right to an effective cross-
examination. Jessica's reasons for making the telephone call were
of marginal relevance to begin with, and the rebuttal of such
evidence for credibility purposes was just that much more
tangential. Van Arsdall, 475 U.S. at 679. Dispositive is the fact
that the record reveals that both defendants' attorneys were given
ample room to impeach Jessica's credibility otherwise. Tracey, 675
F.2d at 437. We therefore find no error in this single limitation.
 The final argument in this arsenal is advanced by
Anderson alone and requires little discussion. Arguing that he was
denied the right to cross-examine the juvenile witnesses with
regard to promises and inducements, Anderson directs us to a
portion of the transcript from day four of the trial. Those pages,
however, detail the results of a side-bar instituted after
Anderson's counsel objected to a certain line of questioning by the
government. The government eventually backed off the inquiry, and
approached the issue more permissibly. Although at one point in
the colloquy Anderson's counsel expressed concern about "promises,
rewards and inducements," Tr. IV at 99, there is nothing else in
that portion of the record to suggest that either defendant was
being estopped from pursuing a line of cross-examination. To the
contrary, it was the government whose course of questioning was
being corrected. If there is any substance to the argument
elsewhere in the record, we have not been alerted to it, and it is
therefore deemed waived. Zannino, 895 F.2d at 17.
 IV
 The convictions and sentences below are affirmed.